UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD WOODARD,

        Petitioner,

                                   CASE NO. 2:13-CV-15120
    v.                             CHIEF JUDGE GERALD E. ROSEN
                                   MAGISTRATE JUDGE PAUL J. KOMIVES

CINDI S. CURTIN,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.   *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     C.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     D.   *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     E.   *Expert Testimony (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     F.   *Jury Issues (Claims III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          1.    *Participation of Alternate Juror (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          2.    *Extraneous Information (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
               a.  Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
               b.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     G.   *Ineffective Assistance of Counsel (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
     H.   *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . 35
          1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
     I.   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     <u>REPORT</u>:

A.      *Procedural History*

        1.      Petitioner Ronald Woodard is a state prisoner, currently confined at the Oaks Correctional Facility in Manistee, Michigan.

        2.      On May 18, 2011, petitioner was convicted of first degree child abuse, MICH. COMP. LAWS § 750.136b(2); and involuntary manslaughter, MICH. COMP. LAWS § 750.321, following a jury trial in the Jackson County Circuit Court.  On July 1, 2011, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS §769.12, to concurrent terms of 23-40 years' imprisonment on each conviction.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through appointed counsel, the following claims:

        I.      DEFENDANT'S CONVICTIONS FOR FIRST DEGREE CHILD ABUSE AND INVOLUNTARY MANSLAUGHTER MUST BE VACATED BECAUSE THE PROSECUTION PRESENTED CONSTITUTIONALLY INSUFFICIENT EVIDENCE THAT DEFENDANT COMMITTED THESE CRIMES.  US CONST AM V, XIV; CONST 1963, ART 1, § 17.

        II.     THE ADMISSION OF INAPPROPRIATE AND HIGHLY PREJUDICIAL EXPERT TESTIMONY VIOLATED DEFENDANT'S RIGHT OF DUE PROCESS WHERE A MEDICAL EXPERT IMPLICITLY TESTIFIED TO INTENT, JUDGED THE CREDIBILITY OF DEFENDANT, AND REPUDIATED MEDICAL CONCLUSIONS THAT DID NOT FIT THE PROSECUTION'S THEORY OF THE CASE.

        III.    MR. WOODARD WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHEN THE ALTERNATE JUROR WAS NOT DISMISSED BEFORE THE CASE WAS SUBMITTED TO THE JURY, BUT WAS INSTEAD PERMITTED TO REMAIN IN THE JURY ROOM AND INSTRUCTED TO PARTICIPATE IN DELIBERATIONS.

2

IV.   MR. WOODARD WAS DENIED A FAIR TRIAL WHERE EXTRANEOUS INFORMATION WAS INTRODUCED TO THE JURY, AND THE JURY WAS ENCOURAGED TO CONDUCT EXPERIMENTS; ALTERNATIVELY HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Woodard*, No. 305131, 2012 WL 3322332 (Mich. Ct. App. Aug. 14, 2012) (per curiam).

4.     Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Woodard*, 493 Mich. 919, 823 N.W.2d 599 (2012).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 17, 2013.  As grounds for the writ of habeas corpus, he raises the four claims that he raised in the state courts.

6.     Respondent filed her answer on June 13, 2014.  She contends that petitioner's second through fourth claims are barred by petitioner's procedural default in the state courts, and that each of petitioner's claims is without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from the death of a two-year old child.  Petitioner was charged with first degree child abuse and felony murder.  He was convicted of first degree child abuse and the lesser offense of involuntary manslaughter.   The evidence adduced at trial was briefly summarized by the Michigan Court of Appeals:

This case arises out of the death of the two-year-old son of Christy Brown and Jerry Russell.  Brown testified that on January 19, 2010, she left her son with Woodard, her live-in-boyfriend, while she was at work.  According to Brown, when she returned home she found her son lying in his crib, nonresponsive.  The victim

3

was transported to the hospital, where it was discovered that he had sustained traumatic head injuries.  The injuries were beyond the scope of what the hospital could handle, so the victim was airlifted to the University of Michigan Children's Hospital.  Emergency surgery was performed, however, the victim was declared brain dead shortly after his arrival and he died the next day.

*Woodard*, 2012 WL 3322332, at *1.  The evidence was more fully summarized in petitioner's brief

on appeal:

Sherry Bowser, the live-in girlfriend of Cameron's father, Jerry Russell, watched Cameron from Friday through Sunday, January 18, 2010.  There were no marks on him when she sent him home.  Bowser looked at forty pictures of Cameron's bruises and injuries taken at the hospital and cried as she told the jury that each one was not there when she last saw Cameron.  Defense counsel objected to re-showing the same bruises and injuries from different views.  The objection was overruled.  Cameron was sociable, a good eater who never vomited, and was beginning to talk.  Cameron would say "bite" if he was hungry.  "Up.  Up." if he wanted to be picked up, but was not ready for potty training.  When asked how Cameron told her he didn't want to go home, Brower said, "I want to stay with you," and then "Stay with you, dad."  Cameron never fell at their house.  The police were mistaken when they arrested Jerry for beating and choking Christy Brown.  Regarding Bowser's testimony and her prior meeting with the prosecutor, she stated, "I understand what my role is today."

Jerrold Russell, Cameron's father, saw his son every weekend, and when Christy Brown couldn't handle him.  Russell had begun to potty train his son.  When Russell took Cameron back to Brown, Cameron had no marks, bruises, wounds, or sores on him.  Like Bowser, Russell pointed to injuries he had not seen before, on the hospital photographs.  Russell kept a calendar noting the days he had his son because he wanted joint custody, to help Brown out.  Russell admitted joint custody would mean he would not have to pay child support.  The day before the incident when Russell took Cameron home, Cameron asked to stay with him.  Russell had seen a bruise on the child's leg.  Previously Russell had filed a complaint against Brown after she told him Cameron was vomiting.  CPS closed the case.  Russell photographed three bruises so he could make another report with CPS.  Russell identified copies of pages from his calendar, which failed to note any bruises.  The child had gotten bruises when in Russell's care.  One time Russell refused to watch Cameron unless Brown signed an agreement for joint custody.  Russell thought Woodard might hit him.  Brown threw a rock through his window.  Woodard told Brown not to throw the rock.  Cameron was never whiney or crying with Russell, and had no trouble eating.  Russell testified he did not assault Brown; the officer was wrong.

Christy Brown, Cameron's mother, was granted immunity for her testimony.  Brown had various people watch her son while she worked.  January 19, 2010, was

4

the first time Woodard watched Cameron.  Cameron was clingy and skittish once Woodard moved in, although he was that way with all strangers.  The child began vomiting when he was 6 months old, before he met Woodard.  Brown and Woodard had just begun potty training.  Brown disciplined Cameron in a time-out chair, and told Woodard he was not allowed to spank her son, because that was the parents responsibility.

On Monday, January 18, 2010, Jessica Homminga, Brown's cousin, watched Cameron in the afternoon while Brown, who was pregnant with Woodard's child, went to the hospital.  Homminga told Brown that Cameron's arm hurt.  Brown checked and found nothing.  When they returned home, Brown took a bath with Cameron.  The only injuries Brown saw on Cameron was a bruise and scratch on his forehead from when he tripped on the dog.  After Brown and Woodard went to bed, Brown's cell phone rang.  Woodard answered.  It was Travis Bateman.  Woodard yelled at him.  The following morning at 6:40 am Brown locked her keys in the van.  Woodard helped her get in the van.  Woodard called Brown at work between 8:00 and 10:00 am to let her know he and Cameron were up and watching cartoons, and again at 1:00 pm to tell her he tripped and fell while carrying Cameron, but they were fine, although Cameron hit his head.  After running errands, Brown returned home with Homminga.  Woodard told Brown that Cameron fell asleep on his chest, so he put him to bed.  When Brown went to get Cameron, she could not wake him up.  Brown's daughter Haley, age 7, and Haley's grandmother, Barbara Trepka, arrived.  Woodard called 911.  Paramedics took Cameron to Foote Hospital/Allegiance Health.  The police arrived at the hospital.  Cameron was transferred to U of M Hospital, and died the next day.

Brown was shown photographs of Cameron taken at the hospital.  The injuries to Cameron's penis happened when his penis got caught in his zipper and when he shut a toilet seat on it, but not the marks to his scrotum and head of the penis.  The shoulder injury, and the bruise and cut on his face he got from the dog.  Brown identified the new marks.  Brown was not home when Cameron hurt his penis in his zipper pajamas.  Cameron told Brown many times that Woodard and Spiderman hit him.  When confronted about spanking, Woodard said Cameron needed more discipline.  Brown never say any marks or bruises.  Woodard spanked Cameron once over his diaper.  During an argument, Woodard told her she should have had an abortion when she was pregnant with Cameron.  Brown kicked him out for four days.  Once, Brown wanted to see if she could trust Woodard with Cameron, so she surprised them and found them playing with toy cars and trucks.  Brown identified pictures of the interior of her home.  The dog would not go in the bathroom because that was used as her cage.  Brown's cousin, Breanna Young, who had been living with Brown, was asked to leave once Woodard moved in.  Woodard and Young did not like each other.  Brown threw a rock at Russell's house during a fight, and in another fight Russell chock-slapped her.  Russell is a violent man, who played rough with Cameron.  Brown identified a picture Woodard took of Cameron using the toilet at 12:23 pm the day of the injury.  Brown has a brain disease, Chiari Malformation, which causes long term memory problems.  CPS investigated Brown,

with regard to her daughter Haley. Brown never saw the bruises Russell photographed. Neither Brown or Woodard ever abused Cameron.

Paramedic Steven Malone, responded to a call that came in at 1:47 pm – a child was unresponsive. Woodard told Malone at 12:45 pm, he fell and the child hit his head on a door jamb. Malone transported the boy to the E.R. at Foote Hospital.

Kelly Barker, RN, met Cameron in the emergency room. Barker became concerned when she saw bruises and red marks in his genital area. Dr. MacGregor filed a police report. Barker described the pictures the police took of Cameron. Cameron was transferred by air to U of M. Brown told Barker that the child had dropped a toilet seat on his penis.

Travis Bateman had dated Brown's cousin, Breanna Young. Cameron was not very sociable, but was playful with him. Cameron was unhappy around Woodard. Bateman called Brown at 2 am in January of 2010, and Woodard answered. They fought because Bateman told Woodard he had sex with Brown. Bateman never would have tripped on the dog.

Trisha Taylor, babysat Cameron before Woodard moved in with Brown. On January 19, 2010, at 10:30 or 11:00 am, when Taylor went to Brown's to buy marijuana Cameron was laying on the couch watching cartoons. Woodard told Taylor that Travis called the night before and said he slept with Brown three weeks prior. Woodard was questioning if Brown was pregnant with his baby.

Barbara Trepka, Haley Brown's grandmother, had just brought Haley home when Brown couldn't wake Cameron up. Woodard told Trepka he was carrying Cameron and tripped over the dog. Trepka put a red X on the area at the door jamb between the kitchen and dining room wall where Woodard said Cameron may have hit his head. Woodard had a rug burn on his elbow. Trepka thought Cameron disliked Woodard.

Brandon Warnsley, had been Woodard's friend from June of 2009 until December 2010. The friendship ended when Warnsley thought Woodard was after his girlfriend. Once that occurred, Warnsley called Christy Brown and told her Woodard called Cameron "Crybaby Cecil" and said he wished he could kill Cameron. Warnsley thought Cameron was scared of Woodard, yet he only saw Woodard tap Cameron on his hand once. Woodard wanted Brown to discipline Cameron. Brown just yelled at the child. Woodard thought Brown might be cheating on him.

Dr. Terrance MacGregor, expert in emergency room medicine, attended Cameron when he was brought unresponsive to Allegiance Health. Cameron was put on a ventilator. CT scans showed inter-cranial injury, bleeding in his brain, and a skull fracture. Dr. MacGregor thought the trip over the dog would "kinda, you know, kind of make sense; but it doesn't explain, didn't explain the other findings with the additional bruising of the extremities and genitalia." Dr. MacGregor, wanting to err on the side of safety, filed a report of suspected child abuse. Bruising was consistent with a "fatal short fall" analysis.

Jessica Homminga, Christy Brown's cousin, watched Cameron on January 18, 2010 when Brown and Woodard went to the hospital. After playing drums,

Cameron told her that Woodard hurt his shoulder. She did not change his diaper. Previously, Homminga saw Woodard spank Cameron two times over his diaper. She told Brown, who broke up with Woodard for a few days. Brown picked Homminga up after work the next day. Brown told her they had to hurry because Woodard had tripped while carrying Cameron out of the bathroom, and Cameron hit his head. When they got there, Cameron was unresponsive. Woodard told her Cameron was dizzy and wanted to sleep. Woodard said he did not know not to let a child sleep after a fall, because of the chance of a concussion. Woodard had a rug burn on his elbow. Trepka and Hayley arrived, Cameron would not wake up, Woodard called 911, and paramedics responded. The dog was a new house pet who did not like the bathroom. Woodard kicked the dog for making him fall. While at the hospital, Woodard asked Homminga to drive him to CVS for his medicine. Defense counsel objected as to what kind of medicine Woodard needed. The discussion became heated and defense counsel spent an hour in jail for contempt of court. Homminga was allowed to tell the jury that Woodard was taking Saboxin.

Dr. Hugh Garton, expert in pediatric neurosurgery, treated Cameron at U of M. Dr. Garton used the CT scans taken at Foote Hospital, and x-rays taken at U of M to explain the child's head injuries – bruising, brain hemorrhage (subdural hematoma, between the skull and surface of the brain), and skull fracture. Dr. Garton operated on Cameron to remove the blood clot, and to decompress the brain which had shifted due to swelling. Cameron was declared brain dead. Typically, Dr. Garton saw these type[s] of injuries [in] a high speed car accident, or a fall from several stories. After reviewing medical records, including Dr. Mohr's, Dr. Garton did not think that the child's head contacting a door frame would easily explain the injuries. Dr. Garton was concerned because there were bruises on both sides of the head, and hitting the door frame would account for only one – for two bruises the child would have to have hit the floor also. If the adult cushioned the child's head as they fell, then the injuries would not match up. Dr. Garton described a fatal short fall; medical reports document significant trauma from these falls. If the man holding the child did not break the child's fall, then this would be compatible with a fatal short fall. Dr. Garton said from his experience, people could not always remember and recreate how a fall happened. Dr. Garton would expect the child to cry after this injury unless he were unconscious; if the child's level of consciousness was reduced, he might or might not cry. A child with a decreased level of consciousness might have difficulty walking and might appear sleepy. All the injuries occurred at the same time. It was possible that Cameron rubbed his head, said he was okay, didn't cry, and then fell asleep.

Sergeant Jeffrey Mazur, responded to an unconscious child dispatch, and organized a suspicious death investigation. Woodard told Mazur after Cameron used the toilet, he picked him up, turned to go into the living room and tripped over a puppy. As they were falling the baby's head hit the door jamb on the bathroom entry door as they fell into the living or dining room. Woodard turned his body to protect Cameron from the fall, and got a rug burn on his elbow. Cameron was responsive, so Woodard held him on his chest and rubbed his back while they watched television

for 20 minutes, until he fell asleep.  Cameron said his head hurt.  Woodard called Brown, who returned and found Cameron unresponsive.  Woodard signed a consent to search form.  Officers photographed the home.  Mazur interviewed the father, Russell, then re-interviewed Woodard.  As to the injuries on the penis, a week prior either Woodard or the child was zipping up the child's pants and the penis and testicles got caught in the zipper.

Breanna Young, Brown's cousin, lived with Brown and Woodard until January, 2010.  Travis Bateman was Young's ex-boyfriend.  Cameron did not like Woodard, because he cried when he was there.  Brown thought this was because she had never had a man live with her before and he had to warm up to Woodard.  Once, Cameron told Young, Spiderman hit him, and Woodard "smacked" him, using that word.  Woodard said it was a pat.  Young never saw Woodard discipline or abuse Cameron.  Woodard said Brown should have had an abortion with Cameron.  Young and Woodard did not like each other; Woodard wanted her to move out.  Brown had been feeding, housing and clothing Young.  Young prepared for trial by reading the entire transcript of the preliminary examination.  It took her one week.

Detective Brett Stiles, watched Det. Ed Smith interview Woodard.  Stiles asked Brown to bring in Woodard's belt.  Brown brought him her belt.  Part of the video of Woodard's interview, where he attempted to reenact the fall, was played for the jury.  Brown told Stiles the injuries to the boy's penis and groin occurred days earlier.

Detective Ed Smith, testified on January 19th Woodard agreed to be interviewed.  Portions of the video interview were played.  On January 22nd Woodard gave Smith his black belt.  Woodard appeared voluntarily for a second interview on January 25th.  Smith found a few minor discrepancies.  Woodard told Smith Bateman called Brown the night before, he answered, they argued and he told Bateman not to call again.  Woodard had doubts that Brown's baby was his.  Woodard said Brown had arranged for Taylor to come by the morning of the 19th to buy marijuana.  Either the dog was lying in the doorway, or the dog came into the doorway, and he tripped.  Cameron was walking unsteadily, and Woodard asked Cameron, "Are you dizzy, Bubba?", and he said "yes."  The child then fell asleep on his chest.  Woodard told Brown about the bruises on Cameron's buttocks after the child returned from his dad's.  Brown replied that his dad is rough with him.  Smith agreed when people describe traumatic situations, they leave things out, or add things, and that does not mean they are lying.  Basically, Woodard's account of the fall stayed the same.  After being told that they way he explained the fall could not have caused the injuries, Woodard agreed, and said, "My God, I thought I'd done something and I didn't," and began to try to help Smith figure out what Brown did to the boy.  Woodard told Smith that she pushed the boy down, and told him to get away from her.  Brown admitted doing this because he was a whiny child who always wanted to be by her side.  Woodard told Smith he had taken a picture of Cameron on the big boy toilet to show mom.  Brown told Smith, Woodard had never hurt Cameron.

Dr. Bethan Mohr, expert in pediatric child abuse, and medical director of the

child-protection team at U of M Hospital, obtained Cameron's medical records, interviewed his parents, spoke to law enforcement and CPS, prior to examining him on January 20, 2010. Mohr took photographs and prepared a report. Mohr discussed Cameron's injuries. Although children can get bruises on their back, and knee, Mohr could not exclude abuse. Bruises can not be dated. Bruises on elbows do not indicate abuse. Mohr found a constellation of red marks inside Cameron's left ankle "most significant" as to her suspicions of abuse due to the location. Mohr was suspicious of the injuries to the penis and scrotum, because Cameron was being potty trained and many times parents get frustrated. It is possible that the child zipped his penis into the sleeper, but Mohr thought there were too many injuries to explain this. Also, the child's mother thought those bruises had disappeared. Cameron could have scratched himself pulling at his penis. Red marks on buttocks are diagnostic of abuse, from a high velocity slap. Mohr reviewed the CT scans. Head injuries in this age group are usually the result of some type of blunt force trauma. Mohr found the history in this particular case of utmost importance, as to her diagnosis of abuse. Mohr did not feel that Cameron falling and hitting his head on the door jamb (as reenacted by Woodard) would cause these types of injuries. Mohr would have expected the child to cry after the injury. Mohr acknowledged that there were scientific studies regarding fatal short falls, but disagreed with their results. Cameron was given a fully skeletal survey, and he had no old fractures. The broken clavicle could have happened at the time of the fall, or earlier.

Dr. Bader Cassin, expert in forensic pathology and Washtenaw County medical examiner, reviewed medical records, talked to police, and examined Cameron Russell. The cause of death was head injuries. Cassin showed the jury photographs taken at the autopsy: the broken collarbone, brain, back, buttocks, depth of bruises, injuries above the ankles. After performing the autopsy, Cassin was unable to determine with certainty the manner of death, so he listed it as indeterminate, either accident or homicide. Cassin reviewed the January 19, 2010 videotaped interview of Woodard re-enacting the fall, and found the injuries inconsistent with this account, because there was no secondary impact with the floor. However, Cassin admitted that the re-enactment was not done with Woodard holding a child, with a dog, in the home, and that people sometimes can not recreate the details of what happened in events like this. The bruises on Cameron's lower legs could have been caused by Woodard's hands. The prosecutor put forth a hypothetical:

> " . . . (I)f the defendant were holding Cameron by his ankles would a swing of (sic) Cameron by the ankles where Cameron's head ultimately strikes a fixed hard surface, would that cause the injuries to Cameron's head?"

Cassin testified the head injuries would be consistent with this scenario, although he found no other evidence that would support this theory. The cluster of injuries on the ankle may have an alternate explanation. Cameron may have cried, walked or staggered around, before he became unconscious within a time frame of 20 minutes. The clavicle injury could have been caused by falling on his shoulder,

or by an adult male pressing his thumb on the clavicle. The presence of bruises does not mean they were caused by someone else. The bruises on the buttocks were caused by striking something, perhaps a table or door jamb. These bruises could have occurred with the fall. Regarding Dr. Mohr, and others trained in child abuse pediatrics, Dr. Cassin testified "their inclination is to find abuse." . . . "That is what their goal is."[1]

Dr. Cassin explained a fatal short fall is a fall of less than four feet. Although some people do not believe in fatal short falls, research proves them wrong. This is one reason why children wear helmets on tricycles, and hockey players wear caps. A fatal short fall can not be excluded here. The fatal injury would come when the child hit the floor, not the door jamb. Woodard did not see the child hit the floor, but he heard it. In this case, it was impossible to determine whether the manner of death was accident or homicide. Dr. Cassin did not change the manner of death from indeterminate.

The defense motion for a directed verdict was denied. The People rested.

Dr. Daniel J. Spitz, expert in forensic pathology and medical examiner for Macomb and St. Clair Counties, reviewed the autopsy documents, medical records and reports, photographs, police records, preliminary examination testimony, and Woodard's videotaped statement. The cause of death was head trauma to the back of the head, and the manner of death was indeterminate. Spitz could not exclude an accidental scenario regarding the head injury. Some of the bruises were consistent with the reenactment. Some may be the result of a two year old playing. The source of the clavicle injury could have been the fall. The injuries to the buttocks were likely the result of spanking, although Spitz could not date these bruises. Dr. Spitz found it normal that there would be confusion when trying to recreate a sudden event. Regarding Woodard's statement, Spitz testified:

> What I, the take home message that I, that I have from the, the, the interview that was done as well as the video is that there was essentially consistency in what was said and what was, what was mentioned to the police and that was one of the reasons why I don't think it's reasonable to discount that scenario. And, furthermore, scientifically the forces are such in my opinion that the injuries could be accounted for that way.

Regarding child abuse experts, Dr. Spitz testified that they are capable of diagnosing and documenting injuries, but that they tend to "err on the side of, of never missing a potential child abuse related injury." Dr. Spitz found this prudent in the case of a living child, because then further investigation could be done by

---

[1]Although Dr. Cassin was not definitive in his conclusion, as detailed in petitioner's state court brief, Dr. Cassin did testify that petitioner's version of events was inconsistent with the victim's injuries, because petitioner's version accounted for two short of a fall to establish the force needed for the fall. *See* Trial Tr., Vol. VI, at 27-28. According to Dr. Cassin, petitioner's version was "inconsistent with the reality of the injury mechanism," *id.* at 28, because the victim's skull was fractured at its thickets part and the injuries were more consistent with injuries from a car accident or long fall. *Id.* at 28-30.

social workers, in case the child needed protection. However, when the child is deceased there is no reason to overcall the injury. The skeletal survey showed Cameron had no prior unreported injuries. Spitz was unable to determine the cause of the redness or injury to the penis. The Macomb County Medical Examiner facility is not accredited nationally, although only 70 of 3,000 jurisdictions are accredited nationwide, and only two are in Michigan. In 2010, Dr. Spitz conducted an autopsy where the body had been immersed in water for 30 days and was severely decomposed. After a second autopsy, a bullet fragment was found. Spitz changed the manner of death after learning of the fragment. There is a legal obligation to change the death certificate if you learn it is wrong. Dr. Spitz was not surprised that Dr. Cassin did not amend the manner of death on the death certificate.[2]

       * * * *

[Following closing arguments, jury instructions, and the parties' agreement that all 13 jurors sitting be allowed to deliberate and reach a verdict, the jury retired for deliberations]. During deliberations, the jury sent notes asking for a copy of the floor plan Barbara Trepka put a red X on, a tape measure, and the photograph of Cameron sitting on the toilet. The jury also wanted to know if Woodard took a lie detector test and if he passed. Further, the jury wanted to know the name of Woodard's medication. The jury was told if the wanted to see the DVD, it would be played for them. The jury was shown the photo of Cameron on the toilet. A Craftsman twenty-five foot tape measure was given to the jury. The court told the jury that they could hear Jessica Homminga's testimony again, but were not to conduct internet research to clarify Woodard's medicaiton. As to the polygraph, Judge McBain stated:

    I'm gonna answer the issue on the polygraph. The court is not allowed to let either party in a criminal case mention whether a polygraph was offered or administered, because their results are inadmissible under Michigan law.

Six hours later, the jury requested clarification on element number four of second degree murder. Defendant requested language that it wasn't an accident. The Court re-read the second degree murder [instruction] changing element four as follows:

    Third, that the death was not excused or done under circumstances that reduce it to a lesser crime, involuntary manslaughter.

The court also re-read the revised instruction on involuntary manslaughter.

At 9:31 am Judge McBain met with counsel to discuss a jury question. It was agreed that the court re-read an amended version of first degree felony murder to the jury when they arrived at 11:00 am. Also the jury was to be given DVDs of four doctors' and Christy Brown's testimony.

At 10:53 am the Court became aware that one juror had brought to court

_____

    [2]Dr. Spitz testified that petitioner's account and re-enactment did not account for all of the victim's injuries, *see* Trial Tr., Vol. VI, at 107, 113, and ultimately agreed with Dr. Cassin's assessment, *see id.* at 99, 141.

research she found on the internet – a glossary of legal terms she found on the PAAM website.  The Juror was removed from deliberations, leaving 12 jurors to deliberate.

Def.-Appellant's Br. on Appeal, in *People v. Woodard*, No. 305131 (Mich. Ct. App.), at 2-18 (citations to trial transcript omitted).

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

12

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the

holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).  The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Sufficiency of the Evidence (Claim I)*

Petitioner first contends that the prosecution presented insufficient evidence to prove his guilt beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief

on this claim.

      1.     *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam). The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). Likewise, a reviewing court "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. As the Court has explained, "the only question

under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. Under the amended version of § 2254(d)(1) a federal habeas court's review is "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). A state court's decision that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference under AEDPA." *Coleman*, 132 S. Ct. at 2065; *see also*, *Cavazos*, 132 S. Ct. at 4.

In analyzing the sufficiency of the evidence, "[i]t is well-established that circumstantial evidence alone can be sufficient to support any burden of proof, even where, as in a matter of substantive criminal liability, the prosecution's proof must be beyond a reasonable doubt." *United States v. Jones*, 31 F.3d 1304, 1316 (4th Cir. 1994); *see also*, *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984). "[C]ircumstantial evidence is intrinsically as probative as direct evidence even where the conviction rests solely upon circumstantial evidence." *United States v. Taylor*, 599 F.2d 832, 838 (8th Cir. 1979) (citing *Holland v. United States*, 348 U.S. 121 (1954)). As the Supreme Court explained in *Holland*:

> Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Holland*, 348 U.S. at 140.

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*,

16

*Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  *Coleman*, 132 S. Ct. at 2064 (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16).  Petitioner was convicted of first degree child abuse.  Under Michigan law "[a] person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child."  MICH. COMP. LAWS § 750.136b(2).  Under the statute, "'[s]erious physical harm' means any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut."  MICH. COMP. LAWS § 750.136b(1)(f).  To establish first degree child abuse, "[t]he prosecution must prove that . . . the defendant intended to cause serious physical or mental harm or that []he knew that serious mental or physical harm would be caused by" his actions.  *People v. Maynor*, 470 Mich. 289, 295, 683 N.W.2d 565, 568 (2004).

Petitioner was also convicted of involuntary manslaugther.  Under Michigan law voluntary "[m]anslaughter is murder without malice."  *People v. Mendoza*, 468 Mich. 527, 534, 664 N.W.2d 685, 689 (2003).  "Murder and manslaughter are both homicides and share the element of being intentional killings.  However, the element of provocation . . . characterizes the offense of manslaughter [and] separates it from murder."  *People v. Pouncey*, 437 Mich. 382, 388, 471 N.W.2d 346, 350 (1991).  Thus, "[u]nder Michigan law, 'voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation, and before a reasonable time has passed for the blood to cool and reason to resume its habitual control.'"

*Todd v. Stegal*, 40 Fed. Appx. 25, 29 (6th Cir. 2002) (quoting *People v. Fortson*, 202 Mich. App. 13, 19, 507 N.W.2d 763, 767 (1993)).  Involuntary manslaughter, of which petitioner was convicted, "is a catch-all concept including all manslaughter not characterized as voluntary."  *People v. Holtschlag*, 471 Mich. 1, 21, 684 N.W.2d 730, 742 (2004) (internal quotation omitted).  Voluntary manslaughter is distinguished from involuntary manslaughter, which "is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty."  *Mendoza*, 468 Mich. at 536, 664 N.W.2d at 690; *accord People v. Datema*, 448 Mich. 585, 595-96, 533 N.W.2d 272, 276 (1995).  Moreover, a defendant may be convicted "of involuntary manslaughter for an unintentional death resulting from the commission of a felony."  *Holtschlag*, 471 Mich. at 21, 684 N.W.2d at 742.  In short, "[i]f a homicide is not voluntary manslaughter or excused or justified, it is, generally, either murder or involuntary manslaughter.  If the homicide was committed with malice, it is murder.  If it was committed with a lesser mens rea of gross negligence or an intent to injure, and not malice, it is not murder, but only involuntary manslaughter."  *Id*. at 21-22, 684 N.W.2d at 742 (footnotes omitted).

   2.   *Analysis*

   Petitioner contends that the evidence was insufficient to show that he intended to harm the victim.  Rather, he contends the evidence equally shows that the victim's injuries were the result of an accident when he tripped while carrying the victim.  Petitioner argues that neither Dr. Spitz nor Dr. Cassin could say with medical certainty that the manner of death was homicide; that the medical experts testified that the victim's injuries could have been consistent with a short fall, and that even

18

though petitioner's account could not explain all of the victim's injuries it is not uncommon for

people to be unable to recall the details of a fall; that his version of events remained consistent

throughout the investigation; and that the testimony of the lay witnesses was not credible.  The

Michigan Court of Appeals rejected petitioner's claim, reasoning:

> The evidence presented supports a finding that Woodard knowingly or intentionally caused serious physical harm to the victim, that he inflicted this harm with the intent to injure, and that the victim died as a result of these injuries, thus justifying his convictions.
>
> Jackson City Police Department Sergeant Jeffrey Mazur responded to a 911 call from the victim's residence. Mazur testified that Woodard informed him that the victim was using the restroom and Woodard was assisting him. After the victim finished, Woodard picked him up and turned around to exit. Mazur further testified that Woodard explained that while he was carrying the victim, he tripped over the dog, and as Woodard was falling, the victim hit his head on the doorjamb. Woodard claimed that he positioned his body to protect the victim's head from also striking the floor.
>
> The evidence, however, demonstrates an inconsistency between the severity of the injuries and Woodard's version of events. Woodard's medical expert witness stated that Woodard's explanation "cannot be excluded as a potential and legitimate cause for these injuries." But the prosecution's medical experts opined that the extent of the victim's head injuries was inconsistent with Woodard's explanation. Dr. Hugh Garton, the attending pediatric neurosurgeon at the University of Michigan Children's Hospital, testified that the victim's injuries did not appear to be consistent with hitting his head on a door frame. He opined that the victim's brain injury was like something that would be caused by "a high speed motor vehicle accident or a fall from several stories." Dr. Bethany Mohr, a pediatrician at the University of Michigan and an expert in child abuse pediatrics, also believed that the victim's head injuries were inconsistent with Woodard's version of events. Dr. Bader Cassin, the forensic pathologist who conducted the autopsy, listed the victim's manner of death as indeterminate, but also testified that there were inconsistencies between the victim's injuries and Woodard's description of the incident.
>
> There was also evidence presented that Woodard may have abused the victim prior to the incident. Russell, the victim's father, testified that he was concerned about possible abuse because he started noticing bruises on the victim. Brown testified that the victim told her that Woodard was hitting him, and when she confronted Woodard, he allegedly told her that the victim needed more discipline. Further, Brandon Warnsley, Woodard's friend, stated that Woodard told him that he wished he could kill the victim. Moreover, Brown testified that the victim acted differently in Woodard's presence as he was "clingy" and cried more often. This testimony was consistent with the testimony of several other witnesses.

The jury was presented with two possible scenarios: the victim suffered a fatal head trauma when Woodard tripped and fell, or Woodard intentionally inflicted serious physical injury upon the victim. Viewing the evidence in the light most favorable to the prosecution, we find that a rational jury could find beyond a reasonable doubt that Woodard was guilty of first degree child abuse and involuntary manslaughter.

*Woodard*, 2012 WL 3322332, at *2 (footnotes omitted).  The Court should conclude that this determination was reasonable.

As the Michigan Court of Appeals observed, there was significant expert testimony that the victim's injuries were inconsistent with petitioner's version of events, but were consistent with intentional physical abuse.  Dr. Gorton testified that petitioner's version of events did not easily explain the victim's injuries, and that the amount of trauma suffered by the victim was consistent with a high speed accident.  *See* Trial Tr., Vol. IV, at 119-23.  Dr. Mohr testified that petitioner's version was "entirely inconsistent with [the victim's] catastrophic brain injuries," *see id.*, Vol. V, at 175, and that the victim's injuries, particularly those on the victim's back and genitalia, were indicative of abuse.  *See id.* at 139, 147, 166.  Dr. Cassin testified that petitioner's version of events was "inconsistent with the reality of the injury mechanism," *id.*, Vol. VI, at 28, and that the victim's injuries were more consistent with an automobile accident or long fall.  *See id.* at 35.  Even petitioner's own expert, Dr. Spitz, testified that petitioner's version did not account for the victim's injuries.  *See* Trial Tr., Vol. VI, at 98 (as to whether the victim's bruises were consistent with petitioner's version of events, responding that "I think some of them were and, some of them may not be."); *id.* at 106-07 (testifying that the injuries to the victim's buttocks were consistent with spanking and "I don't think that a fall accounts for those injuries."); *id.* at 113 (agreeing with Dr. Cassin that in light of all the victim's injuries "I don't think that the scenario as presented accounts for everything.").  It is true that the medical experts could not definitively rule out petitioner's

20

version of events.  It is well established, however, that the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient.  *See Jackson*, 443 U.S. at 326.  Thus, contrary to petitioner's argument "the lack of medical certainty" does not render the evidence insufficient.  *United States v. Abdelhaq*, 246 F.3d 990, 994 (7th Cir. 2001).  It is enough that the prosecutor's "hypothesis was far more probable in the circumstances than" petitioner's hypothesis.  *Id*.; *see also*, *Williams v. Stovall*, No. 06-15386, 2009 WL 1212980, at *11 (E.D. Mich. Apr. 29, 2009) (Battani, J., adopting report of Komives, M.J.).

Moreover, there was additional evidence supporting the charges.  A number of witnesses testified that the victim did not want to be with petitioner, and that the victim indicated that petitioner had hit him.  The lay witnesses also testified that petitioner had stated that the victim's mother should have had an abortion, and Brandon Warnsley testified that petitioner stated he wished he could kill the victim.  Although petitioner contends that this testimony was not credible, as noted above this Court may not reweigh the evidence or resolve credibility matters in determining whether the evidence was sufficient.  As the Supreme Court has explained, the *Jackson* standard does not permit "fine-grained factual parsing" of the evidence by a reviewing court, *Coleman*, 132 S. Ct. at 2064, nor does it permit this Court to reweigh the conflicts in the evidence or assess the credibility of the witnesses.  The trier of fact was free to draw any reasonable inferences from the evidence, and to resolve the conflicts in the evidence in favor of the prosecution.  In light of the expert medical testimony and the corroborative testimony of the lay witnesses, the jury's verdict was not "so insupportable as to fall below the threshold of bare rationality."  *Coleman*, 132 S. Ct. at 2065.  It therefore follows that the Michigan Court of Appeals's rejection of this claim was reasonable.

E.      *Expert Testimony (Claim II)*

Petitioner next contends that he was denied a fair trial by Dr. Mohr's testimony. Specifically, he contends that Dr. Mohr's testimony exceeded the scope of permissible expert testimony when she testified that the victim's injuries resulted from petitioner's intentional acts and that the injuries were the result of abuse, and when she judged petitioner's credibility. The Court should conclude that petitioner is not entitled to habeas relief on this claim.[3]

### 1.    *Clearly Established Law*

Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal

---

[3]Respondent contends that this claim, as well was petitioner's third and fourth claims, is procedurally defaulted. Because it is clear that petitioner is not entitled to habeas relief on these claims, the Court may resolve the claims on that basis without conducting a procedural default analysis. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003).

court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983). This general rule regarding the limited cognizability of evidentiary claims on federal habeas review applies equally to claims based on the allegedly improper admission of scientific evidence. *See, e.g.*, *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998); *Spencer v. Murray*, 18 F.3d 237, 239 (4th Cir. 1994); *Arnold v. Wyrick*, 646 F.2d 1225, 1228 (8th Cir. 1981); *Albanese v. McGinnis*, 823 F. Supp. 521, 553 (N.D. Ill. 1993).

      2.    *Analysis*

      Here, petitioner cannot show that Dr. Mohr's testimony violated the Michigan Rules of Evidence, much less that her testimony was so unreliable that its admission violated his right to due process. Petitioner contends that Dr. Mohr's testimony was impermissible because it embraced the ultimate issue of whether he knowingly or intentionally caused physical abuse to the trial. As the court of appeals correctly explained, however, "Dr. Mohr never stated that the injuries qualified as 'serious physical harm' under the relevant statute, nor did the doctor express an opinion regarding whether Woodard inflicted the harm 'knowingly or intentionally.'" *Woodard*, 2012 WL 3322332, at *3. Dr. Mohr did testify that the victim's injuries were indicative of physical abuse, Trial Tr., Vol. V, at 117-29, 144-45, 147-49, that the victim suffered "abusive head trauma," *id*. at 182, and that the victim suffered "physical abuse," *see id*. at 190. These medical opinions, however, were

23

proper subjects of expert testimony, and did not usurp the jury's role in deciding the legal questions of whether the victim suffered "serious physical harm" under the child abuse statute or whether petitioner caused this serious physical harm "intentionally or knowingly." Dr. Mohr's opinions were certainly relevant to these ultimate legal questions, but that did not render her testimony improper, either as a matter of state evidence law, *see* MICH. R. EVID. 704 ("Testimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."), or as a matter of federal constitutional law, *see Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). Thus, the admission of Dr. Mohr's opinion that the victim's injuries were caused by physical abuse did not deprive petitioner of a fair trial. *See Revilla v. Gibson*, 283 F.3d 1203, 1212-13 (10th Cir. 2002) (petitioner tried for child abuse murder not deprived of due process by emergency room doctor's expert opinion that victim's injuries were caused by non-accidental trauma)

Petitioner also argues that Dr. Mohr's testimony was improper because it impermissibly commented on petitioner's credibility. The Michigan Court of Appeals rejected this claim, reasoning that Dr. Mohr did not testify regarding petitioner's credibility in general; rather, she merely testified that based on her review of the facts, petitioner's "version of events was inconsistent with the victim's injuries." *Woodard*, 2012 WL 3322332, at *3. This determination was reasonable. Petitioner cites, and I have found, no principle of evidence law that bars testimony that may bear on a witness's credibility such as that offered by Dr. Mohr. On the contrary, courts routinely allow an expert to testify that a defendant's account is inconsistent with the other facts of the case, *see, e.g.*, *State v. Widdison*, 28 P.3d 1278, 1293 (Utah 2001); *People v. Posey*, No. A118361, 2009 WL 151335, at *29-*30 (Cal. Ct. App. Jan. 22, 2009), and rely on such testimony in analyzing the

24

sufficiency of the evidence or the validity of other constitutional claims, *see, e.g.*, *Epperson v. Mullin*, 351 Fed. Appx. 311, 316 (10th Cir. 2009); *Morales v. Ault*, 476 F.3d 545, 551 (8th Cir. 2007); *Oliver v. State*, 748 S.E.2d 510, 513 (Ga. Ct. App. 2013).   In short, "no constitutional provision, law, or rule requires the exclusion of expert testimony simply because it concerns a credibility question." *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 16 (1st Cir. 1997) (internal quotation omitted).   Moreover, even if the admission of this testimony violated state evidence law, petitioner still is not entitled to habeas relief as there is no clearly established federal law which prohibits a witness from commenting on the veracity of another witness under the Due Process Clause.   *See Hamilton v. Denney*, No. 4:10-CV-2083, 2013 WL 5676290, at *5 (E.D. Mo. Oct. 18, 2013); *Crowe v. Prelesnik*, No. 2:11-CV-14529, 2013 WL 1883287, at *8 (E.D. Mich. May 6, 2013) (Rosen, C.J.); *Walker v. Steward*, No. , 2012 WL 6170195, at *25 (M.D. Tenn. Dec. 11, 2012); *Young v. Rapelje*, No. 2:10-CV-11036, 2012 WL 368646, at *6 (Jan. 4, 2012) (Komives, M.J.), *magistrate judge's report adopted*, 2012 WL 368225 (E.D. Mich. Feb. 3, 2012) (Zatkoff, J.). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Jury Issues (Claims III & IV)*

Petitioner next raises two issues relating to the jury.   First, he contends that he was denied a fair trial when an alternative juror was allowed to participate in the deliberations.   Second, he argues that the jury considered extraneous information in arriving at its verdict.   The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Participation of Alternate Juror (Claim III)*

Petitioner contends that he was denied a fair trial by the participation of an alternate juror in deliberations.   Thirteen jurors were seated for petitioner's trial, one to serve as an alternate.   Prior

to the start of deliberations, the following exchange occurred between the trial judge, the prosecutor,

and defense counsel:

| | |
|---|---|
| THE COURT: | . . . .  All right, ladies and gentlemen – counsel, we have the matter of the thirteenth juror.  I take it it is both of your request that we take one off? |
| MR. LYONS: | I will leave it to the court's solemn discretion. |
| MR. GANTRA: | The court – |
| THE COURT: | Mr. Gantra? |
| MR. GANTRA: | The court's discretion, Your Honor. |
| THE COURT: | Well do you all want to go with all 13?  It's really up to the two of you. |
| MR. LYONS: | Well I have no objection to 13. |
| MR. GANTRA: | It's a good group of people. |
| THE COURT: | All right.  So they're all both set.<br>       Ladies and gentlemen, so all 13 of you will deliberate.  All right?  So normally we would draw one off but each side is comfortable with all 13 of you. |

Trial Tr., Vol. VI, at 307-08.  Despite the presence of 13, rather than 12, jurors, the court

nevertheless instructed the jury that it's decision must be unanimous.  Ultimately, only 12 jurors

decided the case, as one of the jurors was excused because she had conducted independent research

regarding legal terms.  *See id.*, Vol. VIII, at 8-12.  The Michigan Court of Appeals rejected

petitioner's claim, concluding that it was waived by petitioner's decision not to object.  The court

also concluded that assuming petitioner had a constitutional right to a 12 member jury that had to

be waived by him personally, he could not show plain error because there was sufficient evidence

to support the verdict, only 12 jurors actually deliberated through to the verdict, and petitioner had

26

not shown that "the limited participation of the thirteenth juror seriously affected the fairness, integrity or public reputations of judicial proceedings." *Woodard*, 2012 WL 3322332, at *3 (internal quotation omitted). The Court should conclude that this determination was reasonable.

Petitioner can point to no clearly established federal law that requires a 12 person jury as a matter of constitutional right. On the contrary, in a case in which less than 12 jurors participated, the Supreme Court explicitly held that a 12 person jury "is not a necessary ingredient of 'trial by jury'" under the Sixth Amendment. *Williams v. Florida*, 399 U.S. 78, 86 (1970). Although there may be a constitutionally mandated minimum size of a criminal jury, *see Ballew v. Georgia*, 435 U.S. 223, 239 (1978) (jury composed of less than six members violates the Sixth Amendment right to trial by jury), beyond this constitutional floor "[t]he Sixth Amendment does not . . . prescribe the size of the jury a state must provide for a criminal defendant." *Mills v. Collins*, 924 F.2d 89, 91 (5th Cir. 1991); *see also*, *Brown v. Louisiana*, 447 U.S. 323, 330-31 (1980) (citations omitted) (noting that although "there do exist size and unanimity limits that cannot be transgressed if the essence of the jury trial right is to be maintained," the Court has nevertheless "held that the constitutional guarantee of trial by jury prescribes neither the precise number that can constitute a jury, nor the exact proportion of that jury that must concur in the verdict."). Further, the courts that have considered the issue have generally found the use of a jury composed of more than 12 members does not violate the Constitution because a conviction is more difficult to attain with the presence of additional jurors. *See United States v. Reed*, 790 F.2d 208, 210 (2d Cir. 1986) ("Although the risk of conviction by a twelve-man jury might not be appreciably greater than by a thirteen-man jury, we are satisfied that there is no likelihood whatever that a thirteen-man jury would convict more readily than would a twelve-man jury."); *State v. Ledger*, 499 N.W.2d 198, 202-03 (Wis. Ct. App.

1993); *State v. Cuzick*, 530 P.2d 288, 289 (1975) (it is "difficult to see how [defendant] wold be prejudiced by the use of a jury of 13 instead of 12."); *cf. Johnson v. Louisiana*, 406 U.S. 356, 362 (1972) ("Of course, the State's proof could perhaps be regarded as more certain if it had convinced all 12 jurors instead of only nine; it would have been even more compelling if it had been required to convince and had, in fact, convinced 24 or 36 jurors."). In short, because no clearly established federal law prohibits a jury composed of 13 members, petitioner is not entitled to habeas relief.[4]

### 2.     *Extraneous Information (Claim IV)*

Petitioner next contends that he was deprived of a fair trial because the jury considered extraneous information in reaching its verdict. During deliberations, the jury requested and was given, without objection from petitioner, a copy of the floor plan of the home (which had been admitted into evidence), and a tape measure. *See* Trial Tr., Vol. VII, at 4-14. Petitioner contends that the tape measure constituted extraneous information which affected the jury's verdict. The Michigan Court of Appeals concluded that petitioner's claim was barred by his failure to object. Rejecting petitioner's alternative claim that counsel was ineffective, the court reasoned that "the jury

---

[4]*United States v. Olano*, 507 U.S. 725 (1993), and *Manning v. Huffman*, 269 F.3d 720 (6th Cir. 2001), do not compel a different result. In *Olano*, the Court held that the presence of an alternate juror during deliberations violated Rule 24(c) of the Federal Rules of Criminal Procedure. *See id.* at 737. The Court did not, however, suggest that this error amounted to a constitutional violation. *See Robinson v. Harry*, 562 Fed. Appx. 440, 444 (direct appeal cases from federal criminal convictions which do not involve an interpretation of the Constitution do not constitute "clearly established Supreme Court law for the purposes of AEDPA."); *Kesser v. Cambra*, 465 F.3d 351, 382 (9th Cir. 2006) (noting that "pre-AEDPA, direct appeal cases . . . do not illuminate what constitutes clearly established federal law as determined by the Supreme Court."). Moreover, the Court held that the error did not prejudice the defendant. *See Olano*, 507 U.S. at 739-40. In *Manning*, the Sixth Circuit held that the participation of alternate jurors requires a presumption of prejudice, and granted habeas relief to the petitioner. *See Manning v. Huffman*, 269 F.3d at 725. *Manning*, however, did not apply the AEDPA standard of review or suggest that this rule was "clearly established" for purposes of § 2254(d)(1), and its analysis was based solely on cases involving direct appeals from federal criminal trials. And, in any event, the Court may not look to the decisions of the Sixth Circuit as clearly establishing federal law under § 2254(d)(1). *See Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012).

attempting to better evaluate the evidence adduced inside the jury room in the presence of other jurors does not constitute an introduction of an extraneous influence into the deliberative process," and that petitioner could not show an error because his "hypothesis that the jury wanted the tape measure so that it could conduct experiments is based on pure speculation." *Woodard*, 2012 WL 3322332, at \*4. The Court should conclude that this determination was reasonable.

### a. Clearly Established Law

"As a matter of law, clearly established Supreme Court precedent requires that a criminal defendant be afforded the right to confront the evidence and the witnesses against him, and the right to a jury that considers only the evidence presented at trial." *Doan v. Brigano*, 237 F.3d 722, 733 n.7 (6th Cir. 2001) (citing *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965)), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003); *see also*, *Fletcher v. McKee*, 355 Fed. Appx. 935, 937 (6th Cir. 2009). "Thus, under clearly established federal law, jury exposure to extrinsic evidence or other extraneous influence violates a defendant's Sixth Amendment rights, and a state court decision that conflicts with this rule may justify habeas relief under the standard set forth in the AEDPA." *Id.* (citations omitted) (citing *Doan*, 237 F.3d at 736; 28 U.S.C. § 2254(d)(1)). However, a claim that a juror was subject to extraneous influence or that the jury was exposed to extrinsic evidence is subject to harmless error analysis. *See Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000); *Pyles v. Johnson*, 136 F.3d 986, 992 (5th Cir. 1998); *Sherman v. Smith*, 89 F.3d 1134, 1138-40 (4th Cir. 1996). Thus, even if an extraneous influence occurred, petitioner is entitled to habeas relief only if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

29

(1946)); *see also*, *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (explaining that *Brecht* harmless error standard applies on habeas review regardless of whether or under what standard the state court conducted harmless error review).  "There is no bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct."  *Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000) (internal quotation omitted).  In assessing the possibility of prejudice, a court must "review[] the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware."  *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985).  However, "[i]n a habeas corpus proceeding, a state court's findings on whether, and how, extraneous matters affected jury deliberations 'deserve[ ] a "high measure of deference."'"  *Mahoney v. Vondergritt*, 938 F.2d 1490, 1492 (1st Cir. 1991) (quoting *Rushen v. Spain*, 464 U.S. 114, 120 (1983) (in turn quoting *Sumner v. Mata*, 455 U.S. 591, 598 (1982))).

### b.  Analysis

Here, the Michigan Court of Appeals rejected petitioner's claim on two grounds.  First, the court concluded that the tape measure did not constitute extrinsic evidence at all.  This determination was reasonable.  Courts routinely hold that tools or in-jury room experiments which merely aid the jury in assessing the properly admitted evidence do not constitute extrinsic evidence.  For example, in both *United States v. Miranda*, 986 F.2d 1283 (9th Cir. 1992) and *United States v. Brewer*, 783 F.2d 841 (9th Cir. 1986), the Ninth Circuit held that a magnifying glass used by the jury to better examine pictures admitted into evidence did not constitute "extrinsic evidence" the consideration of which violated the defendants' rights.  *See Miranda*, 986 F.2d at 1286; *Brewer*, 783 F.2d at 843. in *Fletcher*, *supra*, the Sixth Circuit found that no extrinsic evidence had been brought before the jury when the jury, using a gun that was admitted into evidence and testimony regarding the likely

location and momentum of the gun if the victim had accidentally shot herself, reenacted the crime to assess the petitioner's defense. *See Fletcher*, 355 Fed. Appx. at 939-40. The court cited numerous cases supporting this proposition. *See id*. (citing *Kurina v. Thieret*, 853 F.2d 1409, 1413-14 (7th Cir. 1988) (no extrinsic evidence where jury reenacted crime in jury room using cardboard replica of murder weapon); *Bogle v. Galaza*, 38 Fed. Appx. 437, 438 (9th Cir. 2002); *United States v. Abeyta*, 27 F.3d 470, 477 (10th Cir. 1994) (jury's reenactment of crime using juror's personal pocketknife did not constitute extrinsic evidence)). In *O'Hara v. Hall*, No. CV03-1227, 2006 WL 932324 (C.D. Cal. Apr. 5, 2006), the jury used a tape measure and umbrella to assist in its consideration of testimony regarding angles of bullet wounds and distances. The court found that "the umbrella was not extrinsic evidence . . . . The jurors merely used the umbrella as part of their common sense analysis of the extensive evidence presented at trial regarding angles, distances, and timing." *Id*. at *14. As these cases demonstrate, the Michigan Court of Appeals could reasonably conclude that the tape measure used in petitioner's case "did not result in extrinsic evidence that subjected the jury to extraneous influence." *Fletcher*, 355 Fed. Appx. at 940. There is no indication in the record that "the jurors understood the [tape measure] itself to have any bearing on the case," *Brewer*, 783 F.2d at 843, and the court of appeals could reasonably conclude that the tape measure was "merely used . . . as part of [the jury's] common sense analysis of the extensive evidence presented at trial." *O'Hara*, 2006 WL 932324, at *14.

Second, the court of appeals determined that petitioner could not show that he was prejudiced by the presence of the ruler in the jury room. This determination, which as explained above deserves a high measure of deference, was likewise reasonable. The experts testified at trial extensively regarding whether the victim's injuries were consistent with petitioner's version of events, and in

particular with a fall from the height alleged by petitioner.  The tape measure merely provided a visual aid for the jury to help assess the distances involved.  The tape measure itself was not evidence of anything related to the case; it was merely a tool to aid the jury in its consideration of the evidence and testimony that had been admitted at trial.  In these circumstances, any error in allowing the jury to use the tape measure was harmless.  *Cf. United States v. Wright*, 392 F.3d 1269, 1280 (11th Cir. 2004) (defendant could not show prejudice from denial of his right to be present when trial court responded to jury request by giving jury a ruler; "[f]urnishing the jury with a ruler was unlikely to have made a difference between a guilty verdict and a judgment of acquittal . . . . The jury viewed the firearm and could estimate its measurements without the advantage of a ruler; the ruler merely functioned as a visual aid.").  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Ineffective Assistance of Counsel (Claim IV)*

Finally, petitioner contends that his trial counsel was ineffective for failing to object to the provision of a ruler to the jury.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for

32

a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.

33

*Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

    2.    *Analysis*

Petitioner contends that counsel was ineffective for failing to object when the trial court allowed the jury to have a ruler. As explained above, the Michigan Court of Appeals rejected this claim, concluding that the ruler did not amount to an extraneous influence, and that in any event petitioner could not show a reasonable probability that but for counsel's error the result of the proceeding would have been different. *See Woodard*, 2012 WL 3322332, at *4. This determination was reasonable. At the outset, petitioner cannot show that counsel's acquiescence amounted to deficient performance. In light of the expert testimony presented at trial, the height of the victim's fall under petitioner's theory of the case was of critical importance. Counsel could have reasonably concluded that allowing the jury to better visualize the heights involved would help, rather than hurt, petitioner's case. In any event, petitioner cannot show that he was prejudiced by counsel's failure to object. As discussed above, the tape measure did not constitute extrinsic evidence, and thus there would have been no basis to object to providing the jury with a tape measure. And in light of the significant evidence presented at trial, the Michigan Court of Appeals could reasonably conclude that the absence of the tape measure would not have created a reasonable probability of a different

34

result.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of

35

probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability. Because this Court may not reweigh the evidence or reject the jury's credibility findings, and because the evidence presented by the prosecution if believed by the jury was more than sufficient to prove petitioner's guilty beyond a reasonable doubt, the resolution of petitioner's sufficiency of the evidence claim is not reasonably debatable. Petitioner cannot show that the introduction of Dr. Mohr's testimony was improper, much less that her testimony was so unreliable that its introduction amounted to a violation of his due process rights, and thus the resolution of petitioner's evidentiary

36

claim is not reasonably debatable.  Because there is no clearly established law that requires a criminal jury to have twelve, and only twelve, members, the resolution of petitioner's claim relating to deliberations by thirteen jurors is not reasonably debatable.  Finally, because petitioner cannot show that the jury's use of a tape measure during deliberations constituted consideration of extrinsic evidence, the resolution petitioner's extraneous influence and related ineffective assistance of counsel claims is not reasonably debatable.  Accordingly, the Court should deny petitioner a certificate of appealability.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local*

37

*231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: September 9, 2014                     s/Paul J. Komives_____
                                             PAUL J. KOMIVES
                                             UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing was sent to parties of record on September 9, 2014, electronically and/or by U.S. mail.
                                             s/Michael Williams_____
                                             Case Manager to the
                                             Honorable Paul J. Komives

38